ALAN A. GREENBERG, State Bar No. 150827
  *AGreenberg@GGTrialLaw.com*
WAYNE R. GROSS, State Bar No. 138828
  *WGross@GGTrialLaw.com*
ADRIANNE E. MARSHACK, State Bar No. 253682
  *AMarshack@GGTrialLaw.com*
LEANNA C. COSTANTINI, State Bar No. 294028
  *LCostantini@GGTrialLaw.com*
GREENBERG GROSS LLP
650 Town Center Drive, Suite 1750
Costa Mesa, California 92626
Telephone: (949) 383-2800
Facsimile: (949) 383-2801

Attorneys for Plaintiff JENNIFER DAVIES

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| JENNIFER DAVIES, an individual,<br><br>                Plaintiff,<br><br>         v.<br><br>BROADCOM CORPORATION, a California corporation,<br><br>                Defendant. | Case No. SACV15-928 AG (JCx)<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES**<br><br>   **1. WAGE DISCRIMINATION (29 U.S.C. § 206(d) & LABOR CODE § 1197.5);**<br>   **2. RETALIATION (29 U.S.C. § 215(a)(3));**<br>   **3. DISCRIMINATION (GOV. CODE § 12940(a));**<br>   **4. FAILURE TO PREVENT DISCRIMINATION (GOV. CODE § 12940(k));**<br>   **5. RETALIATION (GOV. CODE § 12940(h));**<br>   **6. RETALIATION (LABOR CODE § 1102.5);**<br>   **7. WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY; AND**<br>   **8. FRAUD**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Jennifer Davies ("Ms. Davies") alleges as follows:

## JURISDICTION AND VENUE

1.      This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331.  Ms. Davies' claims for damages arise, in part, under the Equal Pay Act, 29 U.S.C. § 206(d) and the Fair Labor Standards Act, 29 U.S.C. § 215(a)(3).  The Court has supplemental jurisdiction over the remaining state statutory and common law claims pursuant to 28 U.S.C. § 1367, given that all the claims are so related they form part of the same case or controversy under Article III of the United States Constitution.

2.      Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391, given that Defendant resides, and a substantial part of the events giving rise to each of Ms. Davies' claims occurred, in Orange County, California.

## NATURE OF ACTION

3.      Defendant Broadcom Corporation (NASDAQ: BRCM) ("Broadcom" or the "Company"), a global leader in the semiconductor industry, unapologetically maintains a "boys club" where male employees and executives degrade and objectify women without recourse and where the Company has imposed institutional barriers to advancement for female employees.

4.      Lacking any established criteria or formal processes for promotions, Broadcom confers its male-dominated leadership complete discretion to make promotion and compensation decisions in an unlawfully discriminatory manner.  In 2009, Broadcom employed only one female at the level of vice president or higher.  By 2014, little progress had been made—only 1 of 9 executive vice president-level employees (those reporting to the CEO) were women (11%), 3 of 20 senior vice presidents were women (15%), and only 9 of 78 vice presidents were female (11.5%).  In those rare instances in which women are promoted to vice president, they are required to work harder and wait longer than their male counterparts to achieve equal compensation and recognition.  In one telling example, a female

1  senior director was transferred to a position previously occupied by a male vice

2  president, and though performing the same duties in the same manner as her male

3  predecessor, she was forced to wait approximately five years before receiving a vice

4  president title and commensurate compensation.  In stark contrast, male senior

5  directors are immediately promoted to vice president when they assume the duties of

6  former vice presidents.

7       5.     The pervasive male-preferential paradigm and effect of Broadcom's

8  discrimination against women is neither limited to executive-level promotions nor

9  limited to actions by male executives.  For example, the former head of Human

10  Resources—a woman—explicitly directed Ms. Davies to "hire a man" when Ms.

11  Davies was hiring for Broadcom's employment law group.  Although Ms. Davies

12  refused to follow this directive and instead hired the most qualified candidates, such

13  refusal had little impact on the Company's overall hiring practices; a fact that has

14  recently undergone public scrutiny.  In 2014, national civil rights leaders pressed

15  major U.S. technology companies to disclose statistics regarding the gender and

16  ethnicity of their employees.  Broadcom refused to comply.  Had Broadcom

17  disclosed such information, as did Facebook, Google, Yahoo, LinkedIn, and other

18  companies, it would have revealed that the vast majority of Broadcom's workforce,

19  approximately 85%,[1] is male.

20       6.     Despite Broadcom's poor track record, Ms. Davies was determined to

21  break the glass ceiling at Broadcom.  She began her employment with Broadcom in

22  November 2006, as the Company's first labor and employment lawyer.  By May

23  2012, Ms. Davies had successfully built and led an essential group within the

24  Company's legal department, the global employment law function.  Ms. Davies

25  _____

26       [1] Portions of this First Amended Complaint have been redacted at
Broadcom's request and in response to the Court's September 8, 2015 order

27  denying, without prejudice, Ms. Davies' request to file an unredacted complaint.

28  [*See* Dkt. No. 80 at 12-14.]

excelled at her job and received, without exception, "above expectations" performance reviews, with the highest possible score in integrity and ethics, and two CEO Achievement and Recognition Awards, which are given to less than 1% of Broadcom employees annually.  Moreover, in February 2013, as an incentive to remain with the Company for at least three additional years, Ms. Davies was awarded more than 10,600 restricted stock units that were scheduled to vest in their entirety in 2016.

7.     Based on her achievements and the global scope of her work, Ms. Davies was, in all respects, a qualified candidate for promotion to vice president. Ms. Davies expressed her aspiration of becoming a vice president to several members of Broadcom's upper-level management.  Unfortunately, Ms. Davies soon learned that Broadcom frowned upon such expressed ambition from female employees and preferred them to be seen and not heard.

8.     After expressing such ambition to Broadcom's general counsel, Arthur Chong, and later being deridingly compared to a "kitten with a ball of yarn" by Mr. Chong, Ms. Davies realized that her prospects for promotion in the legal group were dim.  Such realization was underscored by DeAnn Work, Ms. Davies' then manager, who said that the employment law position was not vice-president eligible.

9.     Seizing upon Ms. Davies' ambitions, Broadcom convinced Ms. Davies to leave her position in the legal group in favor of a position in Human Resources by (falsely) promising a vice president promotion.  Unbeknownst to Ms. Davies and despite assurances to the contrary, however, the HR position into which she was placed was a "dead-end," with no prospects of promotion to vice president.  Making matters worse, when Broadcom hired a replacement for Ms. Davies' employment law position, it hired a man, Mark Daniels, to fill the role and upgraded the position to vice president, while at the same time reducing the responsibilities of the position. Ms. Davies' complaints about the unfair treatment she had received and about the resentment toward the Equal Pay Act expressed by her manager—the head of HR—

1 | were met with hostility and retaliation.

2 |       10.    The death knell for Ms. Davies' career at Broadcom sounded in 2014,

3 | when Ms. Davies uncovered and reported fraudulent conduct by a male Broadcom

4 | executive, including suspected violations of the Foreign Corrupt Practices Act

5 | ("FCPA").  Broadcom turned a blind eye to the reported unethical and unlawful

6 | conduct, and just three months later, Ms. Davies was suddenly and unexpectedly

7 | told that she had been selected for "layoff."  This, however, was not any ordinary

8 | layoff.  Rather, Broadcom terminated Ms. Davies in retaliation for her reporting of

9 | criminal and other misconduct by favored male employees and demanding treatment

10 | equal to that received by her male counterparts.

**PARTIES**

11.    Ms. Davies is an individual residing in Orange County, California.

12.    Broadcom is a California corporation with its principal place of business in Orange County, California.  Broadcom is a publicly traded company with securities registered under section 12(g) of the Securities Exchange Act of 1934.  Broadcom reported total annual net revenue of more than $8 billion for fiscal year-end 2013 and has a total market capitalization of approximately $30 billion.

**FACTUAL ALLEGATIONS**

**I.    Broadcom's Discriminatory and Hostile Work Environment Toward Women**

13.    Broadcom is a global leader and innovator in semiconductor solutions for wired and wireless communications.  It employs more than 11,000 individuals in 40 offices across 25 countries.  In stark contrast to its laudable technological achievements, however, Broadcom has a shameful history, pattern, and practice of discrimination against women.

14.    In recent years, including during Ms. Davies' tenure, Broadcom's efforts at minimizing women's roles in the Company were carried out in part by a female executive, Terri Timberman, who led Broadcom's Human Resources

Department for more than five years and had a preference for working with men. As the sole person Broadcom relied upon for recommending candidates for executive-level promotions or lateral hires in Human Resources, Ms. Timberman secured vice president promotions for two male employees who had limited experience as senior directors (one year and two years, respectively). Her hostility toward women was particularly notable among those with whom she worked most closely. When Ms. Timberman became Broadcom's head of HR in 2009, she had seven direct reports, six of whom were female. By February 2014, only three of her ten direct reports were female. Ms. Timberman hired four direct reports during her tenure, all of whom were men.

15.     On two separate occasions when Ms. Davies received authorization to hire employment attorneys, she sought Ms. Timberman's advice because the HR group was the primary client of the Company's employment law function. Both times Ms. Timberman unabashedly told Ms. Davies that she should "hire a man." Ms. Davies reported Ms. Timberman's discriminatory conduct to Broadcom's Deputy General Counsel, who failed to take any steps to correct Ms. Timberman. Ignoring Ms. Timberman's direction, Ms. Davies interviewed men and women for the roles and hired the candidates she found to be most qualified; both of whom happened to be women. Ms. Davies also hired an employee to report to her when she was in the HR role. Again, Ms. Timberman told Ms. Davies that she should hire a man. Again, however, Ms. Davies determined that the most qualified candidate was a woman and hired her. Ms. Davies' resistance to promoting Ms. Timberman's discriminatory agenda angered Ms. Timberman.

16.     Broadcom's marginalization of women fosters a culture that permits the objectification and degradation of women. For example, at a business meeting in Asia, female employees (including Ms. Davies) were directed to line up and "sashay" down the aisle as if they were models to entertain the male employees. The men whistled and laughed at the women as they complied with their instruction

to sway their hips down the imaginary catwalk.  Ms. Davies found the experience to be humiliating.  She advised the male executives in charge of the meeting that such a practice should not take place in the future and informed Ms. Timberman of the conduct, yet Broadcom took no action.

17.     Other male employees took advantage of Broadcom's uninhibited work environment for their advancement within the Company.  For example, █████

███████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

18.   ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████     To allegedly serve as a role model to the Company, Ms. Timberman instituted a purported "zero tolerance" policy for HR employees caught engaging in these practices.  However, when a

███████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████

**II.   Broadcom's Discrimination and Retaliation Against Ms. Davies**

    A.   <u>Ms. Davies is Repeatedly Denied Promotions Afforded to Similarly Situated Males and Complains of Broadcom's Gender Discrimination.</u>

19.     Despite the discriminatory and hostile environment toward women at Broadcom, Ms. Davies believed that she could break the glass ceiling and effect a change in Broadcom's male-dominated culture.  Ms. Davies has been a labor and employment attorney since 1995.  After many years of practicing labor law at top law firms, including Gibson, Dunn & Crutcher and Paul Hastings, she joined

Broadcom in 2006 as the Company's first labor and employment lawyer.  For 6 years, Ms. Davies led the global employment law function before being recruited to HR in 2012.  During her entire tenure, Ms. Davies was an outstanding and exemplary employee of Broadcom in all respects.

20.     Not long after Ms. Davies became a Senior Director in 2010, Ms. Davies began expressing to various individuals with authority over executive-level promotions her goal of continuing to advance in her career at Broadcom and becoming a vice president.  For example, in late 2011 or early 2012, before she was recruited to HR in February or March of 2012, Ms. Davies attended a meeting with Ms. Davies' then manager, the Deputy General Counsel, to discuss Ms. Davies' career path at Broadcom.  The meeting took place in the Deputy General Counsel's office.  During the meeting, Ms. Davies said that she was interested in advancing to the next level and becoming a vice president.  The Deputy General Counsel, however, told Ms. Davies that her employment law position was not vice president-eligible.

21.     Ms. Davies received further confirmation that she would not be taken seriously as a candidate for vice president in the legal department at a meeting with the General Counsel in 2012.  During the meeting, the General Counsel repeatedly told Ms. Davies and two female colleagues who comprised the company's in-house employment law group that they were like "kittens with balls of yarn," as contrasted with the Company's intellectual property lawyers, all of whom were male.

22.     Ms. Davies expressed her dismay about the General Counsel's remarks to Ms. Timberman in February or March 2012 during a meeting in Ms. Timberman's office.  Understanding Ms. Davies' goal of becoming a vice president, Ms. Timberman suggested that Ms. Davies move to Human Resources. Specifically, Ms. Timberman offered to create a corporate-level HR position for Ms. Davies.  A few days later, before Ms. Davies accepted the HR position, Ms. Davies and Ms. Timberman met again in Ms. Timberman's office.  At that time, Ms.

1  Timberman stated that the HR position would become a vice president position
2  within two years.  Excited for the promise of receiving the same recognition as her
3  male counterparts, Ms. Davies agreed and, on May 1, 2012, transferred to Human
4  Resources in the position of Senior Director, Policy & Investigations, reporting
5  directly to Ms. Timberman.
6      23.     After Ms. Davies transferred from her employment law role in May
7  2012, Broadcom posted the opening in Ms. Davies' former position and sought
8  another attorney at the senior director level to fill it.  Ms. Davies participated in the
9  interview process and interviewed two female employment attorneys, both of whom
10 were qualified for the position.  At Ms. Timberman's urging, however, Broadcom
11 extended an offer to a male, Mark Daniels, whose years and type of experience were
12 similar to Ms. Davies'.  Ms. Davies later learned that Broadcom had hired Mr.
13 Daniels as a vice president, despite the numerous representations that had been
14 made to Ms. Davies that the employment law position was not vice president-
15 eligible.
16     24.     Despite performing the same job functions, the compensation that Mr.
17 Daniels received as a vice president when he began at Broadcom was substantially
18 higher than that of Ms. Davies.  For example, vice presidents then received more
19 than three times the value of equity as senior directors.  Moreover, the target bonus
20 for vice presidents is 50% of base salary, a significantly higher target than the 30%
21 target bonus for senior directors.  Due to Broadcom's financial performance, the
22 bonuses were regularly paid at greater than 100% of target.  The compensation
23 discrepancy was further exacerbated by the value of cliff vesting awards which,
24 again, could exceed three times the amount awarded to senior directors.
25     25.     These compensation differences were particularly egregious given that
26 Ms. Davies' knowledge of domestic and international employment law exceeded
27 that of Mr. Daniels.  Mr. Daniels █████████████████████████████
28 █████████████████████████████████████████  Moreover, the

1    duties of the employment law position vacated by Ms. Davies were decreased soon

2    after Mr. Daniels took the role.  Thus, Mr. Daniels had less responsibility but was

3    given the vice president title and concomitant economic benefits.

4           26.     When Ms. Davies learned that Mr. Daniels had been hired as a vice

5    president, she expressed to Ms. Timberman her frustration that she had been told the

6    position was not vice president-eligible.  Ms. Timberman offered no explanation and

7    instead warned Ms. Davies not to "undermine" Mr. Daniels.  Ms. Davies had no

8    such intentions.  Further, although Ms. Davies felt betrayed by the differential

9    treatment, she still believed that Ms. Timberman would promote her in early 2014 as

10   promised.

11          27.     Before Ms. Davies accepted the role in Human Resources, Ms.

12   Timberman told Ms. Davies that she could expect a vice president promotion during

13   the 2013 Focal (Broadcom's annual review process), the results of which were

14   communicated in early 2014.  Although Ms. Davies, as usual, received excellent

15   reviews, she did not receive the promised promotion to vice president.  When Ms.

16   Davies requested an explanation, Ms. Timberman claimed—for the first time in the

17   approximate two years that Ms. Davies occupied her position in HR—that the

18   position was "not vice president-eligible."  Ms. Timberman admitted that she had

19   repeatedly told Ms. Davies that the position was vice president-eligible, and that Ms.

20   Davies more than met expectations in that role.  Nonetheless, Ms. Timberman

21   sought to justify her new-found contention that the position was not vice president-

22   eligible by claiming that the role was "not strategic" enough to warrant such a title.

23          28.     Ms. Davies was bewildered.  Her position in HR was not only global in

24   scope, but also involved strategic and complex special project work.  Frustrated that

25   Ms. Timberman had induced Ms. Davies under false pretenses to leave her

26   employment law role, Ms. Davies asked whether anyone considered offering the

27   position back to Ms. Davies when Broadcom decided to make it a vice president

28   position.  Ms. Timbeman curtly responded "no, you can yell at me for that" and

1  chastised Ms. Davies for being outspoken about her goal of becoming vice

2  president.  Ms. Davies tried to explain to Ms. Timberman the importance of

3  receiving proper recognition and compensation for her contributions to the

4  Company—particularly considering Broadcom had readily afforded it to similarly

5  situated males employees—but none of this mattered to Ms. Timberman or

6  Broadcom.

7        29.    Ms. Timberman's unlawful motives became all the more apparent to

8  Ms. Davies during a conversation in which Ms. Timberman stated that she "hated"

9  the Equal Pay Act, which prohibits gender-based discrimination.  According to Ms.

10  Timberman, it was "not [her] job to correct for women's inability to negotiate for

11  themselves."  Ms. Davies challenged Ms. Timberman's position by responding that

12  women should receive equal pay for equal work.  Ms. Timberman, however, was

13  unwavering in her views and became angry with Ms. Davies for expressing her own.

14        30.    Following Ms. Davies' complaints, Ms. Timberman became

15  increasingly cold with Ms. Davies.  Her hostility only worsened when Ms. Davies

16  began uncovering unethical and unlawful conduct by a male vice president

17  employed outside the HR department.

18      B.   Ms. Davies Uncovers and Reports Fraudulent Criminal Conduct by a

19            Male Vice President.

20        31.    As the Senior Director of Policy and Investigations, Ms. Davies was

21  responsible for conducting fact-finding internal investigations.  In or about

22  November 2013, Ms. Davies was directed by HR to look into certain invoices that

23  had been identified as suspicious.  At the outset of her investigation, Ms. Davies

24  uncovered an email between a male Broadcom warehouse employee and his male

25  manager, which suggested that Broadcom had been making improper payments to

26  an outside company and that Broadcom employees had instructed that company to

27  falsify invoices to Broadcom.

28        32.    Ms. Davies sought to investigate further the emails of those implicated,

but she could not review the emails of the male vice president presiding over the subject employees absent the permission of Ms. Timberman.  When Ms. Davies requested such permission, Ms. Timberman refused, claiming that she did not believe it was "necessary" and forbade Ms. Davies from reviewing the vice president's emails absent the discovery of a "smoking gun."

33.    Ms. Davies subsequently found that smoking gun—an email that unequivocally established the vice president's knowledge of and participation in the fraud.  After reviewing the email, and left with no other choice, Ms. Timberman reluctantly allowed Ms. Davies to access and review the vice president's emails. Those emails further demonstrated the vice president's involvement in the fraud.

34.    In or around March 2014, Ms. Davies participated in an interview of the vice president in question.  He admitted to the scheme, but was completely unapologetic.  To the contrary, he characterized the investigation as "ridiculous," asserting that "sometimes you have to shake a few trees."  To make matters worse, various Broadcom executives, upon being apprised of the vice president's misconduct, revealed that they were not at all concerned about the dishonesty and malfeasance.  For example, one high-level executive remarked that the vice president's conduct was "not surprising" and that his actions were not sufficiently "egregious" to warrant termination, or even serious discipline.

35.    Ms. Davies recommended that the vice president be terminated, but her recommendation was flatly rejected.  Ms. Davies later learned that the vice president's "punishment" was a written warning from Human Resources, underscoring the sentiment of indifference toward the male vice president's actions. The vice president's manager refused to sign the warning, presumably because he did not believe that the misconduct even warranted any warning at all.

36.    Upon conclusion of the investigation, Ms. Davies submitted to Broadcom a detailed factual report in which she described other suspected nefarious conduct by the vice president.  Moreover, Ms. Davies discovered that the vice

Case No. SACV15-928 AG (JCx)
FIRST AMENDED COMPLAINT FOR DAMAGES

president's responsibilities included serving as Broadcom's liaison with certain foreign government officials in connection with the Company's efforts to receive favorable tax treatment.  Further, the vice president's emails revealed that he had hosted such officials for dinners at his home.  Ms. Davies' expressed concern that the vice president's conduct could potentially subject the Company to exposure under the FCPA, 15 U.S.C. §§ 78dd-1, *et seq*., and recommended that the Company take all necessary steps to ensure that the vice president had not engaged in any unethical or unlawful conduct with foreign government officials.  Ms. Davies also recommended that the Company investigate additional suspected improper payments that she described in the report.

37.     Broadcom refused to allow Ms. Davies or anyone else to conduct the recommended further investigations.  Moreover, to the best of Ms. Davies' knowledge, Broadcom continues to utilize the vice president as its liaison with those foreign government officials.

C.     Broadcom Retaliates Against Ms. Davies Under the Guise of a "Layoff."

38.     During Ms. Davies' investigation of the vice president from November 2013 to March 2014, her career prospects at Broadcom, which were already precarious based on her gender and her legitimate and protected complaints, became even more so.  During the early part of Ms. Davies' investigation, particularly after she sought from Ms. Timberman permission to access the vice president's emails, Ms. Davies observed a change in Ms. Timberman's tone and attitude.  Indeed, Ms. Timberman became progressively less friendly and no longer even attempted to hide her obvious disdain for women, particularly women who expressed any ambition. What is now evident is that Ms. Timberman, in the winter of 2013 and early spring 2014, had conceived a plan to remove Ms. Davies because she was a female lawyer who blew the whistle on a male executive and sought to receive the same opportunities afforded to her male counterparts.

39.     Ms. Timberman began the process of driving out Ms. Davies in approximately March 2014, when Ms. Timberman suddenly claimed that she needed to reorganize her group.  During a meeting in Ms. Timberman's office, Ms. Timberman told Ms. Davies that she wanted to place her in a "line" role that would support the Mobile Platform Solutions ("MPS") group and report to Ms. Davies' male colleague.  To entice Ms. Davies to make the move voluntarily, Ms. Timberman stated that the role would place Ms. Davies on the "fast track" to vice president and that Ms. Davies would finally receive her well-deserved promotion within a year.  Unbeknownst to Ms. Davies, however, the MPS role was a dead-end. When Ms. Timberman made these representations to Ms. Davies, Ms. Timberman knew that the MPS business shortly would be wound up, and when the MPS business inevitably closed, Ms. Davies would lose her job at Broadcom.

40.     Ms. Timberman's hostility toward Ms. Davies and her intention to drive Ms. Davies out of Broadcom is underscored by actions taken by Ms. Timberman as part of the reorganization to protect the positions of Ms. Davies' male colleagues.  For example, while setting Ms. Davies up to be terminated, as part of the reorganization, Ms. Timberman transferred a male senior director—whose performance reviews were inferior to those of Ms. Davies and who had been at Broadcom for far less time—into a position that Ms. Timberman knew would be protected when MPS shutdown.

41.     When Ms. Timberman transferred Ms. Davies out of Policy & Investigations, she also minimized her influence and access to key decision-makers at Broadcom.  Ms. Davies' office was moved from the 4th floor of Building 1 (where the CEO, CFO, General Counsel, Broadcom's co-founder (Dr. Samueli), and Ms. Timberman maintained their offices) to Building 9, off the beaten path.  Ms. Davies' Policy & Investigation responsibilities were then transferred to a male colleague who was significantly less qualified than Ms. Davies for the position.  Thus, after being transferred to the "line" role, Ms. Davies no longer had corporate-wide

1   impact, and her influence was limited to the MPS line of business.

2       42.    Ms. Davies complied with Ms. Timberman's directives and agreed to

3   take the MPS role based on the lie that it would "fast track" her to vice president.

4   However, on June 4, 2014, approximately three months after Ms. Davies assumed

5   the MPS role, Broadcom announced that MPS either would be shut down or sold.

6   The day before the official announcement, Ms. Davies' manager informed Ms.

7   Davies of the sale/shut down and told her that her position would be eliminated.

8       43.    Tellingly, Ms. Davies was the <u>only</u> person in HR who had been

9   definitively selected for layoff before Broadcom's official announcement.  For all

10   other employees in functions supporting the MPS business group, Ms. Timberman

11   put in place procedures to ensure that layoffs would be fair and to avoid exposure to

12   liability.  Executives and HR were required to document, after the Company

13   announced the MPS sale/shut down, which positions would be eliminated and which

14   employees would be terminated.  Despite this policy, Ms. Timberman decided, long

15   before Broadcom announced the MPS shutdown, that Ms. Davies' position would

16   be eliminated and she would be terminated.

17       44.    On the day of the announcement, Ms. Davies went to Ms. Timberman's

18   office to discuss her termination.  During the discussion, it became evident that Ms.

19   Timberman had known the business would be shut down when she placed Ms.

20   Davies into the MPS role in the spring.  Ms. Davies asked why she had been taken

21   out of the Policy & Investigations position and placed in the MPS role when Ms.

22   Timberman knew the business would be shut down.  In response, Ms. Timberman

23   implausibly claimed that Ms. Davies' Policy & Investigations role would have been

24   "even more vulnerable."  The Policy & Investigations role, however, exists to this

25   day.  Further, Ms. Timberman admitted to Ms. Davies that she had advance

26   knowledge that MPS would be shut down, saying only, "I was hoping this wouldn't

27   happen until September."

28       45.    During the meeting, Ms. Davies became emotional.  In reliance on Ms.

Timberman's previous representations that she would become a vice president, Ms. Davies had purchased a new home to be closer to the Company and to re-start her life with her husband after the recent tragic death of her teenage stepson. She explained to Ms. Timberman that she was fearful of losing her home and disrupting the stability she was trying to create for her family following their loss. Instead of displaying empathy toward Ms. Davies, Ms. Timberman angrily chastised Ms. Davies for not maintaining a "poker face" and demanded that she "keep it together." Ms. Davies found Ms. Timberman's response to be stunning in its insensitivity.

46.     Following the announcement, Ms. Timberman implemented a policy directing that any new positions that were opened or created could not be filled without posting such positions to enable all interested internal candidates to apply. Ms. Timberman, however, did not hold herself to this policy. Approximately one month after Broadcom announced the MPS shut down, Ms. Timberman informed the global HR group that she was once again going to reorganize her group. As part of this reorganization, Ms. Timberman created a new position for the former male MPS head, who otherwise would have been laid off, which she did not post for other prospective candidates. Nor did Ms. Timberman invite Ms. Davies to apply for it. To save another male employee's job, Ms. Timberman placed him in a position for which he was not qualified and for which Broadcom had previously interviewed and rejected qualified female candidates.

47.     In the end, a total of three employees in Ms. Timberman's group who directly supported the MPS business were affected by the layoffs—all of whom were female, including Ms. Davies. On or about September 26, 2014, Broadcom terminated Ms. Davies' employment.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

48.     On December 24, 2014, Ms. Davies filed a charge of discrimination and retaliation with the California Department of Fair Employment and Housing. Ms. Davies thereafter received a right to sue notice. Ms. Davies has exhausted all

administrative remedies pursuant to Government Code section 12960.  Further, Ms. Davies commenced this action in a timely fashion.  Attached hereto as **Exhibit A**, and incorporated herein by this reference, are true and correct copies of the charge and right to sue notice.

## FIRST CLAIM FOR RELIEF

### Wage Discrimination, 29 U.S.C. § 206(d) & Labor Code § 1197.5

49.     Ms. Davies hereby re-alleges and incorporates by reference, as though set forth in full herein, Paragraphs 1 through 48 above.

50.     Broadcom discriminated against Ms. Davies in compensation on the basis of her gender by repeatedly denying her promotion to vice president.  For example, when Ms. Davies vacated her role as senior director of Broadcom's legal group, she was replaced by a male, Mr. Daniels, who performed substantially equal or lesser duties and work than Ms. Davies had when she had occupied the role. Because Mr. Daniels was placed in the role as a vice president, however, he received substantially higher compensation than Ms. Davies.  Specifically, as a vice president, Mr. Daniels was eligible for more than three times the value of equity than was Ms. Davies as a senior director.  Moreover, Mr. Daniels' target bonus was 50% of base salary, significantly more than Ms. Davies' 30% target bonus.  Ms. Davies also is informed and believes that Mr. Daniels received a significantly higher cliff vesting award than she did.

51.     Broadcom's decision to compensate Ms. Davies less than her male counterparts was willful and the result of the Company's bias and explicit preference for male employees.

52.     Broadcom's conduct constitutes wage discrimination in violation of the federal and state Equal Pay Acts, 29 U.S.C. § 206(d) and California Labor Code § 1197.5.

53.     Broadcom's wage discrimination has caused damage and harm to Ms. Davies (including lost earnings, salary, bonuses, the value of lost stock options and

awards, and other job benefits), and has caused her to suffer humiliation, embarrassment, and emotional distress, in an amount to be determined according to proof at trial.

54.     Broadcom is also liable for statutory damages pursuant to 29 U.S.C. § 216(b).

## SECOND CLAIM FOR RELIEF

## Retaliation, 29 U.S.C. § 215(a)(3)

55.     Ms. Davies hereby re-alleges and incorporates by reference, as though set forth in full herein, Paragraphs 1 through 54 above.

56.     Ms. Davies verbally complained about Broadcom's gender-based wage discrimination.  Specifically, after Mr. Daniels was hired in 2013, Ms. Davies complained to Ms. Timberman that Mr. Daniels had been made vice president in the employment law role even though Ms. Davies had not been afforded the same opportunity, and had in fact been told that the position was not vice president-eligible.  Ms. Davies again complained to Ms. Timberman in 2014 that Mr. Daniels was receiving greater compensation for performing equal or lesser duties and work than Ms. Davies had when she had occupied the role.  During the same time period, Ms. Davies challenged Ms. Timberman's explicit resistance to complying with Equal Pay Act.

57.     As a result of Ms. Davies' complaints regarding, and resistance to, Broadcom's unlawful practices, Broadcom engaged in a course of retaliatory conduct, which included, among other things: (1) denying her promotion to vice president, a position that had been promised to her and for which she was highly qualified; (2) denying Ms. Davies the same compensation afforded to those employees selected for promotion to vice president; (3) subjecting Ms. Davies to a hostile work environment; and (4) ultimately terminating Ms. Davies' employment.

58.     Broadcom's conduct constitutes retaliation in violation of the Fair Labor Standards Act, 29 U.S.C. § 215, which makes it unlawful for an employer to

retaliate against an employee who complains about violations of the Fair Labor Standards Act.

59.     Broadcom's retaliatory acts have caused damage and harm to Ms. Davies (including lost earnings, salary, bonuses, the value of lost stock options and awards, and other job benefits), and have caused her to suffer humiliation, embarrassment, and emotional distress, in an amount to be determined according to proof at trial.

60.     Broadcom's acts alleged herein were undertaken with the intent to injure Ms. Davies, or with a willful and conscious disregard of her rights, and constitute oppressive, malicious, and fraudulent conduct.  As a result, Ms. Davies is entitled to an award of punitive and exemplary damages in an amount sufficient to punish Broadcom, and to make an example of and deter Broadcom from engaging in such conduct in the future.

61.     Broadcom is also liable for statutory damages pursuant to 29 U.S.C. § 216(b).

### THIRD CLAIM FOR RELIEF

### Discrimination, Gov. Code § 12940(a)

62.     Ms. Davies hereby re-alleges and incorporates by reference, as though set forth in full herein, Paragraphs 1 through 61 above.

63.     Broadcom intentionally discriminated against Ms. Davies on the basis of her gender by the conduct specified above, which includes, among other things: (1) on multiple occasions, denying Ms. Davies' promotion to vice president, a position that had been promised to her and for which she was highly qualified, and instead providing the position to similarly situated or less qualified male employees; (2) denying Ms. Davies the same compensation afforded to similarly situated or less qualified male employees who were selected for promotion to vice president; (3) subjecting Ms. Davies to a hostile work environment by, for example, having her sashay for the entertainment of male employees and describing Ms. Davies as a

"kitten[] with a ball of yarn"; (4) viewing her as having too many "female" characteristics; and (5) ultimately terminating Ms. Davies' employment.

64.      By reason of the foregoing, Broadcom discriminated against Ms. Davies on the basis of gender, in violation of the California Fair Employment and Housing Act (FEHA), Government Code §12940(a).

65.      Broadcom's discriminatory acts have caused damage and harm to Ms. Davies (including lost earnings, salary, bonuses, the value of lost stock options and awards, and other job benefits), and have caused her to suffer humiliation, embarrassment, and emotional distress, in an amount to be determined according to proof at trial.

66.      Broadcom's acts alleged herein were undertaken with the intent to injure Ms. Davies, or with a willful and conscious disregard of her rights, and constitute oppressive, malicious, and fraudulent conduct.  As a result, Ms. Davies is entitled to an award of punitive and exemplary damages in an amount sufficient to punish Broadcom, and to make an example of and deter Broadcom from engaging in such conduct in the future.

## FOURTH CLAIM FOR RELIEF

### Failure to Prevent Discrimination Gov. Code § 12940(k)

67.      Ms. Davies hereby re-alleges and incorporates by reference, as though set forth in full herein, Paragraphs 1 through 66 above.

68.      During the course of Ms. Davies' employment, Broadcom fostered an environment that condoned discrimination against and harassment of Ms. Davies and other women by, among other things, subjecting women to demeaning treatment and a hostile environment, and favoring male employees in hiring, promotion, and retention over similarly situated female employees.  For example, Broadcom ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ Ms. Davies herself was subjected to demeaning treatment by, among other things, being

required to sashay for the entertainment of male employees, being described by the General Counsel as a "kitten[] with a ball of yarn."  Additionally, Ms. Davies was subjected to hostile treatment by Ms. Timberman, who, among other things, chastised Ms. Davies for complaining of the unfair treatment she had received, impeded Ms. Davies' ability to carry out her duty to investigate misconduct by male employees, told Ms. Davies that she was too vocal about her ambition, viewed Ms. Davies as having too many "female" characteristics (other than her career aspirations), and berated Ms. Davies for not maintaining a "poker face" after learning of her termination.  Moreover, Broadcom took action in response to Ms. Davies' complaints that Ms. Timberman had instructed her to "hire a man" and that she was receiving unequal compensation on the basis of her gender.

69.     Broadcom intentionally discriminated against Ms. Davies on the basis of her gender by the conduct specified above, which includes, among other things: (1) denying Ms. Davies' promotion to vice president, a position that had been promised to Ms. Davies and for which she was highly qualified, and instead providing the position to similarly situated or less qualified male employees; (2) denying Ms. Davies the same compensation afforded to similarly situated or less qualified male employees who were selected for promotion to vice president; (3) subjecting Ms. Davies to a hostile work environment; and (4) ultimately terminating Ms. Davies' employment.

70.     Ms. Davies informed Broadcom of the above-described discriminatory conduct at the Company to which she had been subjected.  Thus, Broadcom had actual or constructive knowledge of such conduct, yet failed to take any action in response.  Instead, consistent with its practice of condoning discrimination against women, Broadcom retaliated against Ms. Davies for reporting such conduct.

71.     Broadcom's failure to take all reasonable steps to prevent discrimination against Ms. Davies, and to take immediate and appropriate corrective action to remedy the discrimination constitutes a violation of FEHA, Government

1  Code § 12940(k).

2  72.  Broadcom's failure to protect Ms. Davies from discrimination has

3  caused damage and harm to Ms. Davies (including lost earnings, salary, bonuses, the

4  value of lost stock options and awards, and other job benefits), and has caused her to

5  suffer humiliation, embarrassment, and emotional distress, in an amount to be

6  determined according to proof at trial.

7  73.  Broadcom's acts alleged herein were undertaken with the intent to

8  injure Ms. Davies, or with a willful and conscious disregard of her rights, and

9  constitute oppressive, malicious, and fraudulent conduct.  As a result, Ms. Davies is

10  entitled to an award of punitive and exemplary damages in an amount sufficient to

11  punish Broadcom, and to make an example of and deter Broadcom from engaging in

12  such conduct in the future.

13  **FIFTH CLAIM FOR RELIEF**

14  **Retaliation, Gov. Code § 12940(h)**

15  74.  Ms. Davies hereby re-alleges and incorporates by reference, as though

16  set forth in full herein, Paragraphs 1 through 73 above.

17  75.  Ms. Davies opposed Broadcom's practice of discrimination by, among

18  other things: (1) admonishing management for requiring female employees to

19  sashay for the entertainment of male employees; (2) refusing to give preference to

20  male employees over more qualified female employees in hiring or promotion

21  decisions; and (3) complaining of Broadcom's hostility toward the Equal Pay Act.

22  76.  As a result of Ms. Davies' objections and assertions of her lawful

23  rights, Broadcom engaged in a course of retaliatory conduct, which included, among

24  other things: (1) denying Ms. Davies' promotion to vice president, a position that

25  had been promised to her and for which she was highly qualified; (2) denying Ms.

26  Davies the same compensation afforded to those employees selected for promotion

27  to vice president; and (3) ultimately terminating Ms. Davies' employment.

28  77.  Broadcom's conduct constitutes retaliation in violation of FEHA,

Government Code § 12940(h), which makes it unlawful for an employer to retaliate against an employee who reports or otherwise opposes prohibited discrimination.

78.     Broadcom's retaliatory acts have caused damage and harm to Ms. Davies (including lost earnings, salary, bonuses, the value of lost stock options and awards, and other job benefits), and have caused her to suffer humiliation, embarrassment, and emotional distress, in an amount to be determined according to proof at trial.

79.     Broadcom's acts alleged herein were undertaken with the intent to injure Ms. Davies, or with a willful and conscious disregard of her rights, and constitute oppressive, malicious, and fraudulent conduct.  As a result, Ms. Davies is entitled to an award of punitive and exemplary damages in an amount sufficient to punish Broadcom, and to make an example of and deter Broadcom from engaging in such conduct in the future.

## SIXTH CLAIM FOR RELIEF
### Retaliation, Labor Code § 1102.5

80.     Ms. Davies hereby re-alleges and incorporates by reference, as though set forth in full herein, Paragraphs 1 through 79 above.

81.     Ms. Davies, pursuant to her duties as Senior Director, Policy & Investigations, uncovered fraudulent conduct by a Broadcom executive.  Further, Ms. Davies had reasonable cause to believe that the Broadcom executive in question had engaged in other fraudulent conduct as well as conduct in violation of the FCPA, 15 U.S.C. §§ 78dd-1, *et seq*.  Ms. Davies reported the fraud and other suspected violations to various Broadcom executives who had authority over the executive in question and authority to investigate, discover, or correct the violations.

82.     As a result of Ms. Davies' reporting of such unethical and unlawful conduct, Broadcom retaliated against her by, among other things: (1) denying Ms. Davies' promotion to vice president, a position that had been promised to her and for which she was highly qualified; (2) denying Ms. Davies the same compensation

afforded to those employees selected for promotion to vice president; (3) subjecting Ms. Davies to a hostile work environment; and (4) ultimately terminating Ms. Davies' employment.

83.     Broadcom's conduct constitutes retaliation in violation of Labor Code § 1102.5, which makes it unlawful for an employer to retaliate against an employee for reporting violations of federal and state laws.

84.     Broadcom's retaliatory acts have caused damage and harm to Ms. Davies (including lost earnings, salary, bonuses, the value of lost stock options and awards, and other job benefits), and have caused her to suffer humiliation, embarrassment, and emotional distress, in an amount to be determined according to proof at trial.

85.     Broadcom's acts alleged herein were undertaken with the intent to injure Ms. Davies, or with a willful and conscious disregard of her rights, and constitute oppressive, malicious, and fraudulent conduct.  As a result, Ms. Davies is entitled to an award of punitive and exemplary damages in an amount sufficient to punish Broadcom, and to make an example of and deter Broadcom from engaging in such conduct in the future.

86.     Broadcom is also subject to a statutory penalty pursuant to Labor Code § 1102.5(f).

## SEVENTH CLAIM FOR RELIEF
## Wrongful Termination in Violation of Public Policy

87.     Ms. Davies hereby re-alleges and incorporates by reference, as though set forth in full herein, Paragraphs 1 through 86 above.

88.     Ms. Davies opposed Broadcom's practice of discrimination and harassment by, among other things: (1) admonishing management for requiring female employees to sashay for the entertainment of male employees, (2) refusing to hire or promote male employees over more qualified female employees, and (3) complaining of Broadcom's failure to comply with the Equal Pay Act.

89.     In addition, pursuant to her duties as Senior Director, Policy & Investigations, Ms. Davies reported fraudulent conduct and suspected FCPA violations by a Broadcom executive and recommended that Broadcom terminate the executive's employment and further investigate other suspected criminal conduct. As a result of Ms. Davies' actions, Broadcom terminated her employment.

90.     The public has a fundamental interest in a workplace free from discrimination and retaliation, as embodied by the California Constitution, Article I, Section 8 and the Fair Labor Standards Act.

91.     The public also has a fundamental interest in ensuring that companies comply with federal securities laws, as embodied by the Dodd-Frank Act and the Sarbanes-Oxley Act of 2002.

92.     Broadcom's termination of Ms. Davies' employment constitutes wrongful conduct in violation of fundamental public policy.

93.     Broadcom's wrongful conduct in violation of fundamental public policy has caused damage and harm to Ms. Davies (including lost earnings, salary, bonuses, the value of lost stock options and awards, and other job benefits), and has caused her to suffer humiliation, embarrassment, and emotional distress, in an amount to be determined according to proof at trial.

94.     Broadcom's acts alleged herein were undertaken with the intent to injure Ms. Davies, or with a willful and conscious disregard of her rights, and constitute oppressive, malicious, and fraudulent conduct.  As a result, Ms. Davies is entitled to an award of punitive and exemplary damages in an amount sufficient to punish Broadcom, and to make an example of and deter Broadcom from engaging in such conduct in the future.

## EIGHTH CLAIM FOR RELIEF

### Fraud

95.     Ms. Davies hereby re-alleges and incorporates by reference, as though set forth in full herein, Paragraphs 1 through 94 above.

96.     During a meeting in the Deputy General Counsel's office, Broadcom, through its Deputy General Counsel, represented to Ms. Davies that her position in the employment law section was not vice president-eligible.  Ms. Davies does not know the exact date of the meeting, but to the best of her recollection, the meeting took place in late 2011 or early 2012, before she was recruited to HR in February or March of 2012.

97.     Over the course of two separate meetings in Ms. Timberman's office, Broadcom, through Ms. Timberman, represented to Ms. Davies that if she transferred to a corporate-level HR position, she would become vice president within two years.  Ms. Davies does not know the exact dates of the meetings with Ms. Timberman, but to the best of her recollection, both meetings took place in February or March of 2012, within a few days of each other.

98.     Broadcom's representations were false and known to be false, or made with reckless disregard for the truth, at the time they were made.  In fact, the employment law position was vice president-eligible, as evidenced by Broadcom's hiring of Mr. Daniels as a vice president.  In addition, the HR position was not vice president-eligible.

99.     Ms. Davies was not aware of the falsity of Broadcom's representations. In reasonable reliance on Broadcom's false representations, Ms. Davies agreed to transfer from her employment law role to the HR role.

100.     Further, during another meeting in Ms. Timberman's office, Broadcom, through Ms. Timberman, represented to Ms. Davies that by transferring to the MPS role she would be on a "fast track" to vice president and would become vice president within a year.  Ms. Davies does not know the exact date of the meeting with Ms. Timberman, but to the best of her recollection, the meeting took place in March 2014.

101.     Broadcom's representation was false and known to be false, or made with reckless disregard for the truth, at the time it was made.  In fact, Broadcom

1  intentionally concealed from Ms. Davies that MPS soon would be shut down or sold
2  and that Ms. Davies' position would be eliminated.

3        102.   Ms. Davies was not aware of the falsity of Broadcom's representation.
4  In reasonable reliance on Broadcom's false representation, Ms. Davies agreed to
5  transfer to the MPS role.

6        103.   Broadcom's fraud has caused damage and harm to Ms. Davies,
7  including lost earnings, salary, bonuses, the value of lost stock options and awards,
8  and other job benefits.

9        104.   Broadcom's acts alleged herein were undertaken with the intent to
10 injure Ms. Davies, or with a willful and conscious disregard of her rights, and
11 constitute oppressive, malicious, and fraudulent conduct.  As a result, Ms. Davies is
12 entitled to an award of punitive and exemplary damages in an amount sufficient to
13 punish Broadcom, and to make an example of and deter Broadcom from engaging in
14 such conduct in the future.

15                    **<u>PRAYERS FOR RELIEF</u>**

16       WHEREFORE, Ms. Davies requests and prays that the Court enter judgment
17 in her favor and against Broadcom for:

18       A.     General and special damages according to proof at trial, including,
19 without limitation, lost earnings, salary, bonuses, the value of lost stock options and
20 awards, and other job benefits Ms. Davies would have received but for Broadcom's
21 wrongful conduct;

22       B.     Emotional distress damages;

23       C.     Punitive and exemplary damages in an amount sufficient to punish
24 Broadcom, and to make an example of and deter Broadcom from engaging in such
25 conduct in the future;

26       D.     Statutory damages and penalties as appropriate, including without
27 limitation, pursuant to 29 U.S.C. § 216(b) and Labor Code § 1102.5(f).

28       E.     Reasonable attorneys' fees to the extent allowable by law;

F.     Costs of suit herein;

G.     Pre-judgment and post-judgment interest, as provided by law; and

H.     Such other and further relief as the Court may deem just and proper.

DATED:  October 8, 2015          GREENBERG GROSS LLP

By:      /s/ Alan A. Greenberg
         Alan A. Greenberg
         Wayne R. Gross
         Adrianne E. Marshack
         Leanna C. Costantini
         Attorneys for Plaintiff
         JENNIFER DAVIES

1

## **DEMAND FOR JURY TRIAL**

2

Plaintiff Jennifer Davies hereby demands a jury trial.

3

4

DATED:  October 8, 2015                GREENBERG GROSS LLP

5

6

7                                        By:      /s/ Alan A. Greenberg

8                                                 Alan A. Greenberg
                                                 Wayne R. Gross
9                                                 Adrianne E. Marshack
                                                 Leanna C. Costantini
10                                                Attorneys for Plaintiff
                                                 JENNIFER DAVIES
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT FOR DAMAGES